

# NUMBER 13-24-00040-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

## IN THE INTEREST OF E.G., A CHILD

---

### ON APPEAL FROM THE COUNTY COURT AT LAW
### OF ARANSAS COUNTY, TEXAS

---

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Peña**
**Memorandum Opinion by Chief Justice Contreras**

Appellant J.G. challenges the trial court's order involuntarily terminating his parental rights to his biological daughter, E.G.[1] By three issues, J.G. argues: (1) there was insufficient evidence to find that he committed an act or omission specified in Texas Family Code § 161.001(b)(1); (2) the trial court erred by denying a motion for extension filed by appellee, the Department of Family and Protective Services (the Department);

---

[1] We refer to appellant and the child by initials to protect their identities. *See* TEX. R. APP. P. 9.8(b)(2).

and (3) the termination order violated his constitutional right to equal protection. We affirm.

## I. BACKGROUND

E.G. was born in March of 2012. On January 24, 2023, the Department filed a petition for conservatorship and termination of J.G.'s parental rights, which included an affidavit supporting removal of the child authored by Department investigator Ashley Janak. The affidavit detailed that, between 2017 and 2022, the Department received numerous reports concerning J.G.'s care of E.G., including ten reports of neglectful supervision, four reports of sexual abuse, and one report of physical abuse. After investigations, the Department determined that there was "reason to believe" three of the neglectful supervision reports and the physical abuse report, but the other allegations were listed as either "ruled out" or "unable to determine." As a result of incidents in 2017 and 2018, E.G. was removed from her parents' custody on each occasion but later returned after the parents participated in Department-provided services. The Department provided services to the family again after a report of neglectful supervision in 2022.[2]

At trial on December 13, 2023, Tisa McRoberts testified that she was the Department caseworker assigned to this case. She explained that, on January 23, 2023, J.G. "was involved in a physical altercation with a neighbor" and was arrested for assault. Because J.G. did not provide names of potential caregivers, and because the family had a history of involvement with the Department, E.G. was removed from J.G.'s custody. McRoberts said the Department contacted E.G.'s maternal grandmother, her uncle, and

---

[2] According to the petition, E.G.'s biological mother died on January 20, 2022. E.G. was the only child in the household.

two of her aunts, but none were able to care for the child, so she was placed in foster care. McRoberts testified that she visited E.G. "often" at her foster home and that the child is happy and "doing well" there, though she misses her father. McRoberts said the foster family is stable and willing to adopt E.G. The removal affidavit was entered into evidence without objection.

At the outset of the case, the Department developed a service plan for J.G. which was adopted as an order of the court. The service plan required J.G. to: (1) maintain gainful employment; (2) attend visitation with E.G.; (3) cooperate with the Department; (4) provide a safe home environment for E.G.; (5) take parenting classes; (6) undergo a substance abuse assessment; (7) participate in substance abuse counseling; (8) submit to random drug testing; (9) participate in anger management counseling; (10) participate in a psychosocial assessment and individual counseling; and (11) participate in domestic violence counseling. McRoberts said J.G. helped in creating the service plan, and he acknowledged receiving a copy of it, but he did not sign it because "[h]e was very difficult to track down."

McRoberts identified records showing that J.G. tested positive for methamphetamine in February 2023, but negative in April. In May, J.G.'s hair follicle tested positive for methamphetamine, but the level detected was lower than in February. He tested negative in July.

Around July of 2023, the Department changed its goal from family unification to unrelated adoption because J.G. "ha[d] not done anything on his plan of service" other than drug testing. McRoberts said she was later informed that J.G. had completed his substance abuse assessment and attended individual and group substance abuse

3

counseling sessions. Because he had made some progress on his services, McRoberts arranged for J.G. to visit with E.G. at the Department's office on August 2, 2023. According to McRoberts, the visit was "hard at best" because J.G. was "already upset when he got there." After about ten minutes, McRoberts interrupted the visit to warn J.G. not to talk about the case with his daughter. McRoberts said J.G. became "highly agitated" and E.G. started to cry, so she ended the visit. According to a report in the record, J.G. insulted and threatened to sue McRoberts as he was leaving the office.

McRoberts testified that, at the beginning of the case, she attempted to meet with J.G. at his home address—the apartment from which E.G. was removed in January of 2023—but "[h]e was not there." Later, J.G. gave McRoberts his sister's address, but when she went to meet him at that location, he was not there, and his sister said he did not live there. McRoberts never saw J.G.'s home and therefore could not verify that he was able to provide a safe environment for E.G. The only proof of employment J.G. provided to McRoberts was a "picture of a time clock"; he did not provide any pay stubs, nor did he identify his employer. Further, according to McRoberts, J.G. did not complete parenting classes, domestic violence counseling, or anger management counseling, and he failed to attend drug tests in September and October.

J.G. testified that, on January 23, 2023, he was involved in an altercation while "protecting another young lady" and police arrested him. He said he gave the names of E.G.'s grandmother and aunt as potential caregivers, but police "refuse[d]" to call them. J.G. said he received a copy of the service plan and "[p]artially" understood it. As to the August 2, 2023 visit, J.G. testified:

> [McRoberts] c[a]me barging through the door. It was very unruly. I could not understand. I was trying to explain to my daughter why I thought I was not

4

with her. She kept coming back, coming back. I said, please, just let me spend time with my daughter. She told me before I got there, we were not going to discuss this case, anything—me and her were not going to communicate at all and she did not stop communicating. She would not stop opening the door. I was not doing anything wrong but spending time with my baby.

J.G. testified that, as of the time of trial, he had been employed for two weeks as a truck driver with Pepsi Bottling, and he was living at Broken Chains, a "faith-based recovery center" in Corpus Christi. Previously, he worked for Country's Coastal Construction cleaning out storage units, and he lived in a house provided as part of his employment there. He said that he also lived with his sister for about two months during the pendency of the case. According to J.G., he texted McRoberts several times asking to see his daughter, but "communication was very poor" and "there was no text back." J.G. testified that he obtained his GED and enrolled in a professional truck driving course at Del Mar College. He denied using drugs during the time E.G. was in his custody. When asked why he was unable to complete some tasks in his service plan, J.G. stated:

It's almost impossible, the things that they asked me to do, keep steady employment and try to go to school. It's almost impossible. I have tried. I am doing the best that I can. I am doing way more than I asked [sic], I think. I have gone above and beyond what they asked. I am just asking for a little more time to get an apartment.

The trial court terminated J.G.'s parental rights, finding that he: (1) knowingly placed or knowingly allowed E.G. to remain in conditions or surroundings which endanger her physical or emotional well-being, *see* TEX. FAM. CODE ANN. § 161.001(b)(1)(D); and (2) failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of E.G., who had been in the Department's conservatorship for at least nine months as a result of removal for abuse or neglect. *See id.* § 161.001(b)(1)(O). The court further found that termination of J.G.'s parental rights

5

was in E.G.'s best interest. *See id.* § 161.001(b)(2). Later, the court entered findings of fact and conclusions of law pursuant to J.G.'s request.[3] This appeal followed.

## II. DISCUSSION

### A. Grounds for Termination

By his first issue on appeal, J.G. argues that the evidence was legally insufficient to support grounds for termination under family code § 161.001(b)(1).

### 1. Standard of Review and Applicable Law

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.); *see In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring) ("Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases."). Accordingly, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d at 112.

A trial court may order termination of the parent-child relationship only if it finds by clear and convincing evidence that: (1) the parent committed an act or omission described in family code § 161.001(b)(1); and (2) termination is in the best interest of the child.[4] TEX. FAM. CODE. ANN. § 161.001(b)(1), (2). The "clear and convincing" standard falls between

---

[3] The judgment of termination contains an additional finding that J.G. contumaciously refused to submit to a reasonable and lawful court order rendered in connection with a child abuse or neglect investigation. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(I). However, the trial court did not make any formal findings or conclusions as to these grounds.

[4] J.G. does not challenge the trial court's best interest finding on appeal.

the preponderance of the evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re L.J.N.*, 329 S.W.3d at 671. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

Evidence is legally sufficient to support termination if a reasonable factfinder could form a firm belief or conviction that the finding was true. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). In conducting a legal sufficiency review, we assume that the fact finder resolved disputed facts in favor of its finding if it was reasonable to do so, and we disregard all evidence that a reasonable fact finder could have disbelieved or found to be incredible. *In re L.J.N.*, 329 S.W.3d at 671. We must also consider undisputed evidence, if any, that does not support the finding. *In re K.M.L.*, 443 S.W.3d at 113; *see In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.").

Evidence is factually insufficient to support termination if, "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true. *In re A.C.*, 560 S.W.3d at 631; *In re J.F.C.*, 96 S.W.3d at 266. Under the factual sufficiency standard, we defer to the trier of fact's determinations on the credibility of the witnesses "so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *see In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

## 2. Failure to Comply with Court Order

To establish grounds for termination under part (O), the Department had to establish by clear and convincing evidence that J.G.

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the [Department] for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child . . . .

TEX. FAM. CODE ANN. § 161.001(b)(1)(O). The Texas Supreme Court has recently held that "strict compliance with every detail of a service plan is not always required to avoid" a finding under part (O). *In re R.J.G.*, 681 S.W.3d 370, 379 (Tex. 2023).

> Terminating the parent-child relationship for the parent's failure to comply with a court-ordered service plan necessarily requires a nuanced assessment of the parent's conduct and progress toward plan completion in light of the totality of the plan's requirements and overall goal. In determining whether the Department has established grounds for termination under (O), the trial court should consider the nature and degree of the parent's alleged noncompliance and the materiality of the disputed plan requirement in achieving the plan's stated goal.
>
> . . . .
>
> There may be provisions in particular service plans for which nothing less than strict compliance will suffice to avoid termination. Easy examples are provisions that require a parent suffering from drug addiction to complete a drug treatment program or require a parent just released from prison to refrain from re-offending. Even a single or slight violation of these or other material service plan provisions could justify termination. But other requirements—particularly those that are bureaucratic or technical—may be too trivial, in the larger context of the plan and the parent's overall performance, to have their breach give rise to termination.

*Id.* at 381–82. In *R.J.G.*, where the appellant's service plan required her "to attend classes with a specified service provider" but the appellant "[went] elsewhere (with the Department's approval)," her "technical noncompliance with that requirement" did not support a finding under part (O). *Id.* As another example,

8

while the completion of required parenting classes may well be necessary to obtain a child's return, the caseworker's bare assertion that she 'does not have' a piece of paper proving completion of classes, even if technically required by the plan, cannot support termination when there is other evidence that the classes were completed.

*Id.* The *R.J.G.* Court concluded that

[i]n evaluating whether termination is warranted, the trial court must ensure that any asserted noncompliance is of a requirement that is neither unwritten nor vague but rather "specifically established" in a court-ordered plan. Additionally, to justify termination, the noncompliance must not be trivial or immaterial in light of the nature and degree of the parent's compliance and the totality of the plan's requirements.

*Id.* at 383.[5]

McRoberts testified that, although J.G. underwent a substance abuse assessment, attended substance abuse counseling sessions, attended one visit with E.G., and submitted to some drug tests, he did not maintain gainful employment, he did not demonstrate he was able to provide a safe home environment for E.G., and he did not participate in parenting classes, domestic violence counseling, or anger management counseling, all of which were required by the service plan. J.G. does not dispute that he failed to comply with these provisions, nor does he explicitly argue that his noncompliance was "trivial or immaterial." Rather, he claims that the service plan did not meet statutory requirements and was "defective *ab initio*" because he did not participate in its

---

[5] Prior to *In re R.J.G.*, appellate courts uniformly held that "substantial or partial compliance" will not be enough to avoid a termination finding under part (O). *See In re J.M.T.*, 519 S.W.3d 258, 267 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("A parent's failure to complete one requirement of her [family service plan] supports termination under subsection (O)."); *In re C.M.C.*, 273 S.W.3d 862, 875 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *see also In re M.J.*, No. 13-20-00248-CV, 2020 WL 6750572, at *6 (Tex. App.—Corpus Christi–Edinburg Nov. 18, 2020, no pet.) (mem. op.) ("The Department need only establish the parent's failure to comply fully with a court order—it need not establish any particular quantity of failure or degree of compliance."); *In re D.N.*, 405 S.W.3d 863, 877 (Tex. App.—Amarillo 2013, no pet.) (noting that part (O) does not provide a means of evaluating partial or substantial compliance with a plan, and it does not "make a provision for excuses" for the parent's failure to comply). The Department does not cite *R.J.G.* in its appellee's brief.

development and because McRoberts did not discuss its terms with him. *See* Tex. Fam. Code Ann. § 263.103(a) ("The original service plan shall be developed jointly by the child's parents and a representative of the [D]epartment, including informing the parents of their rights in connection with the service plan process."); *id.* § 263.103(a-1) ("Before the original service plan is signed, the child's parents and the representative of the [D]epartment shall discuss each term and condition of the plan."). He further argues that the statute was "violated" because he did not sign the service plan. *See id.* § 263.103(b) ("The child's parents and the person preparing the original service plan shall sign the plan, and the [D]epartment shall give each parent a copy of the service plan.").

We observe that J.G. did not raise any complaints concerning the content of the service plan in the trial court. The record reflects that an adversary hearing was held on February 2, 2023, after which the trial court signed a temporary order which, in part, required J.G. to comply with the terms of the original and any amended service plan. After a status hearing on March 22, 2023, the trial court signed another order finding, among other things, that "the plans are reasonably tailored to address any specific issues identified by the Department" and that J.G. "has reviewed and understands" the plan, and ordering that "the plan of service issued by this Court shall continue in full force and effect." Notably, J.G. appeared personally and was represented by counsel at both hearings, and his counsel signed both orders. There is no indication that his counsel ever objected to any of the provisions in the service plan or orders. *See* Tex. R. App. P. 33.1(a).

In any event, we disagree that the trial court's finding was erroneous for the reasons suggested by J.G. The family code explicitly contemplates the adoption of a service plan even when a parent is unable or unwilling to participate in the development

of the plan or to sign the plan. *See id.* § 263.103(a) ("If a parent is not able or willing to participate in the development of the service plan, it should be so noted in the plan."); *id.* § 263.103(c) ("If the [D]epartment determines that the child's parents are unable or unwilling to participate in the development of the original service plan or sign the plan, the [D]epartment may file the plan without the parents' signatures."); *see also id.* § 263.103(d)(2) (noting that a service plan takes effect when the parties sign the plan *or* "the court issues an order giving effect to the plan without the parents' signatures"). Moreover, McRoberts testified that J.G. "did help" in the development of the service plan by "answering some questions" in a "Family Strengths and Needs Assessment." The trial court could have reasonably believed McRoberts's testimony and disbelieved J.G.'s testimony to the contrary. *See In re L.J.N.*, 329 S.W.3d at 671; *In re J.P.B.*, 180 S.W.3d at 573.

Next, J.G. contends that the provision of the service plan requiring him to undergo domestic violence counseling was improper because it was not "narrowly tailored" to the circumstances of the case. *See* TEX. FAM. CODE ANN. § 263.202(b)(3) (providing that "[t]he court shall review the service plan . . . for reasonableness, accuracy, and compliance with requirements of court orders and make findings as to whether . . . the plan is narrowly tailored to address any specific issues identified by the department"). He argues specifically that the reports of domestic violence identified in the removal affidavit were "ruled out" by the Department; that "he was not in a romantic relationship with anyone at the time of removal"; and that "[Department] investigations with 'ruled out' findings should be considered res judicata and not used as a basis in formulating a service plan in a new case." However, he does not support his argument with references to authority or the

11

record.[6] We reject it for those reasons. *See* TEX. R. APP. P. 38.1(i).

Finally, J.G. argues the part (O) finding was erroneous because he was unable to comply with the provisions of the service plan despite making a good faith effort to do so. Pursuant to the statute, a part (O) finding may not be made

> if a parent proves by a preponderance of evidence that: (1) the parent was unable to comply with specific provisions of the court order; and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

TEX. FAM. CODE ANN. § 161.001(d). J.G. argues that he established this affirmative defense by evidence that he did not have a car or reliable phone or internet connection; that his required services were based mainly in Corpus Christi, which is forty miles away from his home; and that the Department itself prevented him from participating in visitation.

The trial court did not err in implicitly concluding that this affirmative defense was not established by a preponderance of the evidence. McRoberts testified at trial that she presumed J.G. did not have a car, so she offered to transport him to drug tests, and she set up the other services "to be virtual so he could use his phone." In his brief on appeal, J.G. argues without reference to the record that he "did not have a reliable phone or internet connection" and "McRoberts knew he did not." In her testimony, McRoberts acknowledged that J.G. "changed his [phone] number" during the case, but she denied knowing that he had a "bad phone." For his part, J.G. testified that he has "had a couple different numbers" during the pendency of the case, but when asked whether he was able to participate in Zoom hearings with his phone, he replied, "Yes, partially." He did not

---

[6] We note that, according to the removal affidavit, J.G. "admitted to domestic violence in the presence of [E.G.]" in 2018.

testify that he lacked a reliable phone or internet connection or that he was unable to participate in services because of a lack of transportation or reliable means of communication, and the record does not support those assertions. As to visitation, the trial court could have reasonably believed McRoberts's testimony that J.G. acted inappropriately by discussing the case with E.G. on August 2, 2023, and that this was the reason he was not permitted to continue with visitation. *See* TEX. FAM. CODE ANN. § 161.001(d) (stating that, to establish the affirmative defense to part (O), the parent must show that "the failure to comply with the order is not attributable to any fault of the parent").

We conclude that a reasonable trier of fact could have formed a firm belief or conviction that J.G. failed to comply with "specifically established" requirements ordered by the court under § 161.001(b)(1)(O), and that his noncompliance was not "trivial or immaterial in light of the nature and degree of [his] compliance and the totality of the plan's requirements." *In re R.J.G.*, 681 S.W.3d at 383. Further, the contrary evidence was not so significant as to preclude such a finding. *See In re A.C.*, 560 S.W.3d at 630–31; *In re J.F.C.*, 96 S.W.3d at 266.

### 3.    Endangerment

Ordinarily, to affirm a termination judgment when the best interest finding has not been challenged, an appellate court "need uphold only one termination ground . . . even if the trial court based the termination on more than one ground."[7] *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *see* TEX. FAM. CODE ANN. § 161.001(b)(1); TEX. R. APP. P. 47.1. But an appellate court must always review issues alleging the evidence was

---

[7] For this reason, we do not address that part of J.G.'s first issue arguing that the evidence was insufficient to support termination grounds under § 161.001(b)(1)(I). *See id.*; TEX. R. APP. P. 47.1.

13

insufficient to support findings of endangerment under parts (D) or (E) of family code § 161.001(b)(1), regardless of whether other grounds for termination are unchallenged or sustained on appeal, because an endangerment finding "becomes a basis to terminate that parent's rights to other children" under § 161.001(b)(1)(M). *In re N.G.*, 577 S.W.3d at 234, 237 (holding that "due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights" on endangerment grounds). Accordingly, we review the evidence supporting the trial court's finding under family code § 161.001(b)(1)(D). *See id.*

To establish grounds for termination under part (D), the Department was required to show by clear and convincing evidence that J.G. "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). "Endanger" means "to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The term means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but "it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.*; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Danger to a child need not be established as an independent proposition and may be inferred from parental misconduct. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

Endangerment under part (D) arises when the child's environment creates a potential for danger and the parent is aware of the danger but consciously disregards it. *In re V.A.*, 598 S.W.3d 317, 328 (Tex. App.—Houston [14th Dist.] 2020, no pet.); *In re*

*M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). The relevant time frame to determine whether there is clear and convincing evidence of endangerment is before the child was removed. *In re I.D.G.*, 579 S.W.3d 842, 850 (Tex. App.—El Paso 2019, pet. denied); *Ybarra v. Tex. Dep't of Human Servs.*, 869 S.W.2d 574, 577 (Tex. App.—Corpus Christi–Edinburg 1993, no writ). It is not necessary that the Department show the child's environment directly threatened or injured the child. *See In re M.M.*, 584 S.W.3d 885, 889 (Tex. App.—Amarillo 2019, pet. denied). Termination under part (D) may be based on a single act or omission. *See id.* at 889–90; *In re J.E.M.M.*, 532 S.W.3d 874, 884 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *In re E.M.*, 494 S.W.3d 209, 221–22 (Tex. App.—Waco 2015, pet. denied).

The acceptability of living conditions and parental conduct in the home are subsumed in the endangerment analysis. *See In re V.A.*, 598 S.W.3d at 328; *In re J.E.M.M.*, 532 S.W.3d at 880–81; *In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Likewise, "inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home" under part (D). *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.).

J.G. argues that there was no testimony that his January 23, 2023 physical altercation with his neighbor "was of such a degree" as to endanger E.G.'s physical or emotional well-being. He notes correctly that this incident occurred outside the apartment, while E.G. was reported to have been sleeping inside the apartment. However, as the Department notes, the evidence before the trial court also included the removal affidavit,

15

which explained that, according to the responding officer, J.G. "was the aggressor" and was intoxicated at the time of his arrest for assault. *See id.* The affidavit also set forth that, from 2017 to 2022, the Department found "reason to believe" three separate reports that J.G. provided neglectful supervision of E.G. First, in February of 2017, E.G. exhibited poor hygiene and left the family residence unattended on multiple occasions. As a result, E.G. was removed from her parents' custody and placed with her maternal grandparents; after the parents participated in services, the case was closed in July of 2017. Second, in 2018, both of E.G.'s parents admitted to using methamphetamine in her presence, and both admitted that "domestic violence" occurred in E.G.'s presence. *See Walker*, 312 S.W.3d at 617 (noting that a parent's use of illegal drugs may constitute endangering conduct because "it exposes the child to the possibility that the parent may be impaired or imprisoned").[8] Again, the parents participated in services and the case was closed. Finally, after J.G. was arrested on multiple outstanding warrants in 2022, he left E.G. with an "inappropriate caregiver" and was uncooperative with the Department. Because E.G. had poor hygiene and "often misse[d] school to the point that she failed the third grade," the Department sought removal again, but the request was denied.

The evidence presented, though not overwhelming, would allow a rational trier of fact to form a firm belief or conviction that J.G. knowingly placed E.G. or allowed her to remain in an endangering environment, and the contrary evidence was not so significant

---

[8] McRoberts also testified that J.G. failed to attend drug tests in September and October of 2023. *See In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (noting that a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being); *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (noting that a factfinder can infer that a parent's failure to submit to court-ordered drug testing indicates that the parent was avoiding testing because they were using drugs).

as to preclude such a finding. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Accordingly, the evidence was legally and factually sufficient to support the trial court's finding under part (D) of family code § 161.001(b)(1). *See In re A.C.*, 560 S.W.3d at 630–31; *In re J.F.C.*, 96 S.W.3d at 266.

We overrule J.G.'s first issue.

## B. Motion for Extension

By his second issue on appeal, J.G. argues the trial court erred by denying the Department's motion for extension under family code § 263.401. *See* TEX. FAM. CODE ANN. § 263.401(a) (providing that, after signing a temporary order appointing the Department as temporary managing conservator, the trial court must either commence trial on the merits within one year or grant an extension); *id.* § 263.401(b) (providing that the court may grant an extension only if it "finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the [D]epartment and that continuing the appointment of the [D]epartment as temporary managing conservator is in the best interest of the child"). We review such a ruling for abuse of discretion. *In re A.J.M.*, 375 S.W.3d 599, 604 (Tex. App.—Fort Worth 2012, pet. denied) (en banc).

J.G. argues on appeal that he "was making progress on his service plan" and "if the court had granted the extension, it is reasonable to assume he would have continued making progress sufficient enough for him to have unsupervised visitations with his daughter and possibly, to have his child returned to him under, at a minimum, a 'return and monitor' order." J.G. does not cite authority indicating that a parent "making progress" on a court-ordered service plan constitutes "extraordinary circumstances" which would

17

permit an extension under § 263.401.

We find no abuse of discretion. The record contains an order dated December 12, 2023—the day before trial was scheduled to begin—denying "Petitioner's Motion for Extension" without further explanation. However, as J.G. recognizes, the record does not contain the motion itself or any discussion of it, so we are unable to determine what specific grounds were presented for the trial court's consideration. *See* TEX. R. APP. P. 33.1(a) (regarding preservation of error for appeal). "It is an appellant's responsibility to bring a complete record before the court that shows he is entitled to relief." *Paske v. Fitzgerald*, 499 S.W.3d 465, 470 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (first citing *Enter. Leasing Co. of Hous. v. Barrios*, 156 S.W.3d 547, 549 (Tex. 2004); and then citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 689 (Tex. 1990)); *see* TEX. R. APP. P. 34.5(b) (allowing any party to "file with the trial court clerk a written designation specifying items to be included" in the clerk's record). On this record, we cannot conclude that the trial court erred by denying the Department's motion for extension.

J.G.'s second issue is overruled.

## C.    Equal Protection

By his third issue, J.G. complains that, even though the Department alleged in its petition that "J.G. could be suffering from a mental illness,[9] no steps were taken" to have

---

[9] The Department's petition alleged ten grounds for termination, including the following:

> [J.G.] has a mental or emotional illness or a mental deficiency that renders [him] unable to provide for the physical, emotional, and mental needs of the child and will continue to render [him] unable to provide for the child's needs until the 18th birthday of the child, despite at least six months of reasonable efforts to return the child the parent, pursuant to § 161.003, Texas Family Code.

*See* TEX. FAM. CODE ANN. § 161.003(a). We note that J.G. was immediately appointed an attorney ad litem, as is required by statute when the Department seeks termination under § 161.003. *See id.* § 161.003(b).

him evaluated for mental illness, the service plan was not "tailored" to take into account his potential mental illness, and no guardian ad litem was appointed for him. He contends that, for these reasons, the termination order violated his "constitutionally protected rights to equal protection."

In his argument as to this issue, J.G. does not cite any authority regarding constitutional equal protection rights. *See* TEX. R. APP. P. 38.1(i). He does not cite any authority regarding when a parent subject to termination is entitled to the appointment of a guardian ad litem or a mental illness evaluation. *See id.* Further, despite the fact that he was represented by court-appointed counsel at every step of the proceedings, J.G. did not complain about the service plan in the trial court, did not request a guardian ad litem or mental illness evaluation, and did not file any post-judgment motion alleging that his constitutional rights were violated. *See* TEX. R. APP. P. 33.1(a). The issue has not been preserved or adequately briefed, and we overrule it for those reasons.

## III.    CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Delivered and filed on the
9th day of May, 2024.

---

There was no discussion of any potential mental illness at trial.

19